## BRONK *v.* RILEY *et al.*

*(Supreme Court, Special Term, Albany County.* September 25, 1888.)

1. INJUNCTION—AGAINST RESCISSION OF CONTRACT—ADEQUATE REMEDY AT LAW.
   An injunction will lie to restrain the termination of a contract for the employment of plaintiff, under which he is to receive a commission on all sales made by him, and for the lease of his machinery, at a specified rental, as plaintiff would be without an adequate remedy at law if deprived of the privilege of completing the contract, there being no means of estimating the amount of his damages.

2. SAME.
   The defendants constitute the Albany penitentiary commission. The law creating the commission does not make it a body corporate, nor in terms give any authority to sue it. Plaintiff could not compel the board of county supervisors to audit and allow his claim, as he could not present an itemized and verified claim, nor would an action lie against the supervisors for the breach of this contract. *Held,* that plaintiff was therefore entitled to an injunction.

3. PENITENTIARY—ABOLISHING USE OF MACHINERY—COUNTY INSTITUTIONS.
   Laws N. Y. 1888, c. 586, prohibiting the use of motive-power machinery, for manufacturing purposes, "in any of the penal institutions of the state," and the employment of the convicts therein at certain labor, applies only to the state prisons and such other prisons and reformatories as are constructed by the state, and at its expense.

4. SAME.
   A penitentiary erected by a county, the management of which is vested in local and county officers, the money belonging to which is required to be deposited in the county treasury, and subject to the control of the board of county supervisors, is not a state institution, although prisoners from other counties may be confined in it under contract between the county or penitentiary officers and the state or the county sending such prisoners.

On motion for a temporary injunction.
*Parker & Countryman,* for plaintiff. *D. Cady Herrick,* for defendants.

MAYHAM, J. On the 10th of February, 1888, John McEwen, as superintendent of the Albany penitentiary, as party of the first part, with the written approval of the commissioners of the Albany penitentiary, entered into a contract with the plaintiff, of which the following is a copy: "Agreement, made the 10th day of February, 1888, between John McEwen, superintendent of the Albany penitentiary, of the first part, and Edgar Bronk, of the city of Albany, N. Y., of the second part, witnesseth, that the said first party, pursuant to the authority in him vested by resolution of the commissioners of the Albany penitentiary, does hereby hire and employ the second party as manager and agent to oversee and conduct the manufacture of brushes in said penitentiary by the inmates thereof, and generally superintend the same, and the sale of

the products of said manufacture, under the direction of the first party, and his successors in office, the said second party to receive a commission of ten per cent. upon the sales made by him, to be computed and paid quarterly from the date hereof out of the receipts from said sales. And the second party, in consideration of the foregoing, does hereby agree to devote his whole time and attention to said business, keep the necessary books, to use diligent efforts to make sales of the manufactured product. Said party to pay all the expense of travel of himself or other persons employed to make such sales. It is further agreed by the said party that in consideration of said commissions to be so paid to him, that he will guaranty the collection of all sales made; and in case the first party is unable to collect for any sale so made, the second party is to pay the same, and the same may be deducted from any commissions due the second party. It is further agreed that the party of the first part shall lease from the party of the second part the plant necessary for the manufacture of brushes, at the annual rental of three hundred dollars, to be paid semi-annually, and keep the same in good repair. And it is further expressly agreed by and between the parties hereto that this agreement is to continue for the period of one year from the 10th of February, 1888, and no longer, and that if the legislature shall pass any act abolishing the use of machines, or otherwise affect the labor of said persons, which in the judgment of the commissioners of said penitentiary would render the further continuance of the agreement inexpedient, then, upon notice by them to the second party, this agreement shall cease, and be of no further force and effect." This agreement was signed by the superintendent, McEwen, and this plaintiff, and approved by the other defendants. After the enactment of chapter 586 of the Laws of 1888, and before the commencement of this action, the defendants notified the plaintiff that, by reason of the provisions of said chapter, said contract will be regarded as at an end on and after September 1, 1888, and propose to remove the plant for such manufacture out of said prison, and no longer permit the use of the convicts and machinery in the further performance of said contract, and that after that date said contract will be regarded as of no force and effect. To prevent such termination of said contract, and to compel the defendants to allow the plaintiff to go on under the same without any hinderance, this action is brought, and the plaintiff seeks a stay by injunction during the pendency of this action, in which he demands a perpetual injunction, restraining the defendants from interfering with his performance of this contract. This motion is resisted by the defendants upon the grounds: (1) That an injunction will not be granted to restrain the defendants from terminating this contract; that, if the plaintiff suffers damage by reason of the defendants' refusal to perform, or allow to be performed, this contract, the plaintiff has a lawful and adequate remedy at law to recover damages. (2) That, by reason of the provisions of chapter 586, Laws 1888, the defendants are, under the terms of the contract, entitled to terminate the same.

The rule that an injunction will not issue to restrain a party to a contract from violating its provisions where the party asking for the injunction has an adequate remedy at law, in an action for damages, is elementary, and supported by a uniform current of authorities. Has the plaintiff in this case a clear, ample, and adequate remedy in an action at law for damages for the alleged breach of this contract? By the terms of the contract the plaintiff was to recover, as his share of the avails of the business, 10 per cent. of the amount of gross sales. No other profits or benefits are by the contract to accrue to the plaintiff, except the rental of his machinery, for which he was to be paid quarterly, at a specified amount. As the amount plaintiff was to recover was to depend entirely upon the amount of manufacture and sale, it could only be determined upon a computation quarterly, and that amount would depend upon the amount of goods manufactured, and the price at which they sold in the market, both of which would, from the nature of the case, be

uncertain and incapable of being estimated if the work was suspended by the act of the defendants. That being so, it is difficult to see how the plaintiff could in an action at law, estimate or establish the amount of his damages, if deprived of the privilege of completing the performance of his contract. The case differs from an ordinary contract for service in this: that the contracting parties in this case have a community of interest, based upon the productiveness of the enterprise, whereas, in an ordinary contract for labor, the value of the service does not depend upon the productiveness of the business, but upon the time spent and value of the service of the employer in the generall abor market, or of the compensation actually agreed to be paid. It is true that, as a general rule, an action for a specific performance of a contract for labor will not be enforced in equity; but that is upon the ground that the measure of damage suffered by either party can ordinarily be measured in an action at law. But this rule is not of universal application, and the courts have, in some instances, interfered by injunction to enforce contracts for service where a breach would produce to the plaintiff irreparable injury. *Daly* v. *Smith,* 38 N. Y. Super. Ct. 158. And, indeed, I find no class of contracts where the court of equity will not interfere to prevent irreparable loss or injury, unless the party injured has an adequate remedy at law. "In many cases the court interferes negatively, and restrains covenantor from a breach of his agreement, and thus in effect enforces specific performance." Will. Eq. Jur. 278. Thus injunctions are granted to restrain waste, prevent the cutting of timber, or the removal of crops or manure, at the end of the term, and like cases.    ●

It is also urged on the part of the plaintiff, and claimed in the complaint, that no action at law can be maintained against the defendants for damages, on the ground that by the statute under and by which the office of the Albany penitentiary commission was created no power or authority to sue the commissioners for a breach of their agreement is given; and that therefore no action at law to recover damages for a breach of this contract can be maintained against them. The Albany county penitentiary was constructed under the provisions of chapter 152, Laws 1844. By section 4 of that act it was provided that "the management and direction of said penitentiary, when completed, shall be under the control and authority of said board of supervisors and said mayor and recorder of the city of Albany. This provision remained in force until the enactment of chapter 261, Laws 1885, when all the powers and duties theretofore imposed by law on the board of supervisors of Albany county and the mayor and recorder of the city of Albany, except as in that act modified, relating to the Albany penitentiary, were vested in the Albany penitentiary commissioners. That act named the persons and officers who were to compose the commission. Section 9 of that act provided that all the business affairs of said penitentiary shall be conducted in the name of said commissioners as such, and all liabilities existing against any person or corporation shall be enforced by them in their name as commissioners; but it is urged that there is no authority of law given to prosecute such commissioners for any breach of an agreement made with them. It is true that no such authority is given in terms by the act. The commissioners are not by law made a body corporate. They cannot, therefore, be sued as such on their contracts made as penitentiary commissioners. Like the department of public charities of New York, they can only exercise such powers, and be subject to such liabilities, as are by law expressly conferred on them. *Dock Co.* v. *Mayor, etc.,* 8 Hun, 247; *Swift* v. *Mayor, etc.,* 83 N. Y. 528. Can the city and county of Albany be held liable for a breach of this contract? By section 6, c. 261, Laws 1885, all moneys required to conduct the business of said penitentiary, or the payment of officers or employes thereof, or any disbursement connected with it or its management, (except wages and salaries which shall be paid on the certificate of the superintendent of the penitentiary,) shall be paid upon bills

made out in the same form, and verified in the same manner, as is now required in case of claims presented for audit to the board of supervisors. When such bills are accompanied with the warrant of the superintendent of the penitentiary, specifying the person to whom the services or supplies for which, and the amount in which, such payments are to be made, and duly signed and dated. This provision would entitle the plaintiff to recover or present for audit and allowance all claims for services actually rendered under contract with the commissioners, but it is not perceived how the prospective profits or 10 per cent. commissions provided for in this contract, if the plaintiff is prevented from performing the work or completing the contract, can be estimated, verified, and put in position for audit under the above provision. If prevented from performing this contract, the plaintiff could not present to the board of supervisors his verified claim with the amount liquidated or fixed, and could not, therefore, bring himself within the provisions of law that would authorize him to compel the board of supervisors to audit and allow his claim by *mandamus;* nor does there seem to be such privity between the penitentiary commissioners and the board of supervisors as to authorize an action against them for a breach of this contract. If I am right in the views above expressed, it would seem to follow that the plaintiff's rights under this contract do not rest solely in the value of his services, which might be estimated, and which, if standing alone, might be measured in damages, and for which he might have an adequate remedy in law, but that his interest in the same, and the profits to him by a performance, can only be measured after an actual performance of the agreement, and his damage, if any, for non-performance, cannot be accurately estimated in an action at law for a breach of the contract. Nor can he, under the peculiar circumstances of this case, by reason of the failure of the statute to provide for an action against the defendants or the supervisors, for a breach of a contract of this kind, have redress in damages for a breach of this contract by the defendants. It would seem to follow, therefore, that the plaintiff is entitled to this temporary injunction unless the contingency provided for in the contract has arisen under the provisions of chapter 586, Laws 1888, authorizing the rescission of said contract.

It is insisted on the part of the plaintiff that chapter 586, Laws 1888, has no application to the Albany penitentiary. If that contention be correct, then the contingency provided for in the contract for the rescission or abandonment of the same has not arisen, and that act would furnish no valid excuse for the refusal of the defendants to perform, or to permit the plaintiff to perform, said contract. Section 1 of that act prohibits the use of motive-power machinery, for manufacturing purposes, in any of the penal institutions of the state, and also prohibits the employment of any person in such institutions, while under sentence, where his labor, or the products of the same, is farmed out, contracted, given, or sold to any person. The second section of the act directs the superintendent of state prisons, and all other officers having in charge the management of the penal institutions of the state, to cause only such articles to be manufactured therein by the inmates thereof as are commonly used and consumed in the public institutions of the state, and that all articles manufactured in such penal institutions not required for use therein shall be furnished to the several institutions supported in whole or in part by the state, for the use of the inmates, upon the requisition of the trustees or the managers thereof upon the superintendent of state prisons. Section 3 makes the superintendent of state prisons, the comptroller of the state, and the president of the state board of charities a board whose duty it shall be to determine the value and price at which all articles manufactured in such penal institutions, and furnished for use in the several institutions of the state, shall be furnished. The comptroller is required to devise and furnish to the several institutions a proper form for such requisition, and also a proper system of account to be kept for all such institutions. All money received for such articles upon such

requisition shall be paid into the state treasury, as now required by law, for the sale of products of state prisons. Section 4 appropriates, for the purposes of this act, $250,000 to be expended for the purchase of material to be manufactured in accordance with the provisions of this act, and in manufacturing articles for the use of the state and its institutions only. In construing this statute, for the purpose of determining this question raised on this motion, we are called upon, if possible, to ascertain what is intended and embraced in the phrase "the penal institutions of the state," as used in chapter 586, Laws 1888.

It is worthy of remark that in the title of the bill not only, but also in every provision of the bill where penal institutions are mentioned, they are characterized as "the penal institutions of the state." Is that phrase broad enough to embrace all the penal institutions within the state, and does it include all county penal institutions, such as county jails constructed by counties under general laws for the construction of such local prisons, and also penitentiaries erected and maintained under special laws at the expense of a county? In determining this question, it is manifestly the duty of the court to give effect to the language used in the act according to its usual and ordinary meaning. There is no ambiguity in the language, and there seems to be no occasion for speculation as to the intent of the legislature further than the language employed fairly imports. It is argued by the defendant, with much force of reason, that the object sought to be obtained by this legislation was to relieve free labor from the unjust competition of prison labor, and that competition from the penitentiary is just as injurious as it would be from the state prisons, and that, as this is in its nature a remedial statute, it should be so construed as to give it effect even beyond its letter, in furtherance of this beneficial purpose. It is true that, in construing remedial statutes, they are to be construed liberally with a view to the accomplishment of the beneficial purpose which the legislature intended. But that rule ought not to be so extended by the court as to override the plain language of the act or to result in judicial legislation. "Where the language of a statute is definite, and has a precise meaning, it must be presumed to declare the intent of the legislature, and it is not allowable to resort to other means of interpretation or by conjecture to restrict or extend the meaning." *Johnson* v. *Railroad Co.*, 49 N. Y. 455; *McCluskey* v. *Cromwell*, 11 N. Y. 601. "All statutes must have a construction according to the language employed, and where no ambiguity exists courts cannot correct supposed defects." *Benton* v. *Wickwire*, 54 N. Y. 226. Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced constructions for the purpose of either limiting or extending their operations. The object of interpretation is to bring sense out of the word used, and not to bring sense into them. "If the words embody a definite meaning, which involves no absurdity or contradiction between different parts of the same writing, then the meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such case there is no room for construction." *McCluskey* v. *Cromwell*, 11 N. Y. 602. Tested by these rules of construction, and giving the language its ordinary meaning, without regard to any extrinsic fact or circumstance, would the words "penal institutions of the state" be understood to mean other than the state prisons, and such other prisons and reformatories as are constructed by the state, and maintained at state expense? Or would that phrase, standing alone, and unqualified by any extrinsic fact or circumstance, be understood to embrace all county jails and penitentiaries erected and maintained at local county expense, and governed by local and not state officers?

It is true that, in the early history of the state, county jails were the only penal institutions for the punishment and confinement of persons charged with crime, but in the early statutes by authority of which they were erected

and maintained they were characterized as county jails, and constructed and maintained at local county expense, although their erection and maintenance were authorized by general laws. In 1796 the state-prison system was inaugurated in this state by statute enacted that year, which provided for their erection and maintenance by state officers, and at the state expense. Since that time several state prisons and penal reformatories have in like manner been erected by the state, governed by state officers, and maintained at the state's expense; and their government, management, and discipline have been exclusively the subject of state control. Under this system the people, and their representatives in the legislature, have come to regard them as the penal institutions of the state, as distinguished from local county jails and penitentiaries, which have been understood and regarded by the people as county and not state institutions. I am inclined to the opinion that the legislature, in enacting chapter 586 of the Laws of 1888, had in mind the existence of such distinction, and in enacting that statute did not intend that its provisions embraced county jails or penitentiaries, which had been erected and maintained by counties, and controlled by county officers, and were in no way under the management of the state officers, as are the state prisons. This view is strengthened by an examination of the provisions of that statute, as in many respects its provisions do not seem in harmony with or applicable to the law relating to the management of county jails, or with the special acts prescribing the managment and control of the Albany penitentiary, and particularly so when there is no attempt in this law in terms to repeal existing statutes not in harmony with its provisions. The Albany penitentiary was originally erected by the county of Albany, under the provisions of chapter 152, Laws 1844,—a special act, local in its application, and enacted solely for the erection and management of that institution. Section 4 of that act provided that the management and direction of said penitentiary, when completed, shall be under the control and authority of said board of supervisors, and said mayor and recorder of the city of Albany, who are hereby autnorized and empowered by their votes in joint meeting to establish and adopt rules for the regulation and discipline of said penitentiary, to appoint officers to take charge thereof, to fix their compensation, and prescribe their duties, and, generally, to make all such by-laws and ordinances in relation to the management and government thereof as they shall deem expedient." From this act it is apparent that the Albany penitentiary, in its erection, maintenance, and control, as well as in the expense of its erection and operation, was solely and exclusively a "penal institution of Albany county," and not a "penal institution of the state." Under the above provisions of law the affairs of the Albany penitentiary were administrated by the supervisors of Albany county, and the mayor and recorder of the city of Albany, until the enactment of chapter 261, Laws 1885, entitled "An act in relation to the management of the Albany penitentiary." Section 1 of this act provides that "all the powers and duties now imposed by law upon the board of supervisors of Albany county, and upon the mayor and recorder of the city of Albany, associated with said board, in relation to the maintenance, management, and care of the penitentiary in said city, and the inmates thereof, the establishment and adoption of rules for the regulation and discipline thereof, the appointment of officers to take charge thereof, the fixing of their compensation, and prescribing their duties, together with all other rights, powers, and duties relating to said penitentiary vested in said board of supervisors, or said mayor, recorder, and board of supervisors, except as herein modified, are hereby vested in the Albany penitentiary commission, as hereby constructed." Section 2 of said act makes it the duty of the board of supervisors of Albany county to appoint a resident of the city of Albany as commissioner of the Albany penitentiary commission, who shall be a resident freeholder and citizen of Albany county; and section 3 of said act makes the

district attorney and county treasurer of Albany county *ex officio* commissioners, who, with the commissioner appointed by the board of supervisors, constitute the commissioners of the Albany penitentiary commission. Section 4 of the act authorizes the Albany county penitentiary commission to appoint a superintendent of the penitentiary, and section 6 provides that "the said superintendent of the penitentiary, under the supervision and direction of said commissioners, shall deposit with the county treasurer of Albany county all moneys received by him for said penitentiary, or in its management; and all moneys required in the conduct of the business of said penitentiary, or the payment of officers or employes thereof, or any disbursements connected with it or its management, except wages and salaries, shall be paid upon bills made out in the same form, and verified in the same manner, as is now required in case of claims presented for audit to the board of supervisors of Albany county." It also provides that the county treasurer shall keep an account of the receipts and disbursements provided for in this act. Section 4 provides that the commissioners shall annually present to the board of supervisors of Albany a detailed report of the receipts and disbursements on account for such penitentiary. It seems clear from the provisions of the law above referred to that the Albany penitentiary is purely a county institution, exclusively under the control of local and county officers, whose duties are prescribed by special, and not general, laws, and that the same is conducted and maintained at the county expense exclusively. All the money arising from its earnings or necessary to its maintenance is by law required to be deposited in the Albany county treasury, and is subject to the control of the board of supervisors of Albany county. It is quite impossible to harmonize these provisions of law with the provisions of chapter 586, Laws 1888. Under the provisions of chapter 261, Laws 1885, "the Albany penitentiary commission" is vested under the law with the full management and control of the penitentiary; and if chapter 586, Laws 1888, is to apply to the penitentiary, that control would, in part at least, be transferred to the state comptroller, the superintendent of state prisons, and president of the state board of charities, who are commissioners under that act. By the provisions of chapter 261, Laws 1885, the moneys arising from the transactions of the penitentiary are by law to be paid to the county treasurer; and the duty of paying to the county treasurer is peremptorily enjoined upon the superintendent. By chapter 586, Laws 1888, all moneys arising under the provisions of that act are to be paid into the state treasury. It will be seen from a comparison of the provisions of these two acts that they are utterly inharmonious, and incapable of both standing and being enforced together without producing serious conflict of authority between the Albany penitentiary commission and the state board created under the Laws of 1888. It cannot be assumed that the legislature intended to produce any such conflict.

There are other provisions of the Laws of 1888, which might be examined for the purpose of ascertaining the legislative intent, and bearing upon the question as to whether that act embraced penitentiaries and other county penal institutions. The act of 1888 provides that the articles manufactured under its provisions shall be furnished to the several institutions supported in whole or part by the state, upon the requisition of the trustees or managers thereof, drawn upon the superintendent of state prisons; and it is worthy of notice that, in speaking of the institutions entitled to such benefits, in section 3 of said act, the same language is used as that in designating the penal institutions embraced in the act, viz., "furnished for use in the several institutions of the state." Is that language broad enough to authorize the application of such manufactured articles, upon the requisition of the superintendents of the poor of counties on the superintendent of state prisons, to be applied in clothing county paupers, or on the application of a sheriff of a county to draw supplies for prisoners confined in the county jails, or to al-

low the keeper of the Albany penitentiary or the Albany penitentiary commissioners to draw supplies for the use of the inmates of that institution? And yet it is difficult to see why, if the words "penal institutions of the state" embrace county penal institutions, the words "institutions of the state," used in the same act, should not include county alms-houses, jails, and penitentiaries. Of course, the answers to the above questions are not involved in this motion, and the only object of the inquiries is to test the effect of the act of 1888. I am forced to the conclusion that the legislature, in enacting chapter 586, Laws 1888, were dealing only with state institutions. I do not think that it was the object of the legislature to place state officers in control of county institutions, or that the state would appropriate funds belonging to the state to carry on or maintain purely county, local, or municipal institutions, or that the legislature intended by this act to invade local county institutions, which were created at the expense of the county, carried on and maintained at its expense, and officered by local county officers, and convert the earnings of that institution to the use of the state, or divert its revenues from the county treasury when by law they are required to be deposited to the state treasury, and that without any declaration of an intention of repealing existing laws under which the income of said prison was to be deposited in the county treasury. To give such a construction to the Laws of 1888 would be to repeal, by implication, many of the provisions of chapter 152, Laws 1844, under which the Albany penitentiary was created, as well as the provisions of chapter 261, Laws 1885. In other words, it would, by implication, be repealing a special and local statute by a general statute, without the expression of a legislative intent to do so. This would seem to be an unauthorized construction of statutes. The rule for the construction of statutes is elementary that a general statute does not effect the provisions of a special act relating to a particular locality or institution unless the latter is mentioned and referred to in terms. In the absence of such an express reference, the special or local act will be recognized as in full force, and regarded as creating an exception to the general rule. "No intention of the legislature to repeal or interfere with special statutes applicable only to the city of New York can be implied from general legislation upon the subject. Repeal of statutes by implication is not favored, and only takes place when two acts are so inconsistent that both cannot stand. * * * Laws, special and local in their application, are not deemed repealed by general legislation except upon the clearest manifestation of an intent by the legislature to effect such repeal; and ordinarily an express repeal by some intelligible reference to the special act is necessary to accomplish that end." *People* v. *Quigg*, 59 N. Y. 88. "A special and local statute, providing for a particular case or class of cases, is not partially repealed or amended, as to some of its provisions, by a statute general in its terms, provisions, and application, unless the intent of the legislature to repeal or alter the particular law is manifest, although the terms of the general act would, taken strictly, and but for the special law, include the case or cases provided for by it." *In re Central Park*, 50 N. Y. 497. "A general law will not, in the absence of a very evident intent on the part of the legislature to do so, and which intent must appear by the terms of the act itself, abrogate or change the provisions of a special law passed for a particular case, constituting a class by themselves, for which the general laws of the state do not profess to provide." *In re Canal Co.*, 69 N. Y. 212. Within the general principles for the construction of statutes above referred to, and the decisions above quoted, I think it cannot be successfully maintained that the legislature, by the enactment of chapter 586, Laws 1888, intended to or did repeal the provisions of chapter 152, Laws 1884, or of chapter 261, Laws 1885, and if this be so, it would seem to follow as a necessary result that the act of 1888 has no application to the Albany penitentiary.

But it is urged by the learned counsel for the defendants that, as convicts from

other parts of the state outside of Albany county are confined in the penitentiary, therefore it is a state institution. That argument, at first view, might appear plausible, but when we take into account the fact that such imprisonment can only be made upon contract between the board of supervisors of Albany county, or the local officers of the penitentiary and the state, or the county sending such prisoners to the penitentiary, the argument loses much of its force. Chapter 152, Laws 1844, was amended by chapter 183, Laws 1847, so as to allow the board of supervisors in either of the counties of Rensselaer, Saratoga, Schenectady, Schoharie, Green, and Columbia to enter into an agreement with the board of supervisors of the county of Albany for the receipt and confinement in the penitentiary of certain convicts, sentenced in said counties respectively. And by chapter 261, Laws 1854, similar authority was conferred upon the board of supervisors of Dutchess county to contract with the supervisors of Albany county for the confinement of Dutchess county prisoners in the Albany penitentiary. And by chapter 139, Laws 1858, similar power to contract with their respective boards of supervisors was extended to the counties of Montgomery and Oneida. By chapter 158, Laws 1856, certain minors, convicts, were authorized to be imprisoned in this penitentiary; and by chapter 574, Laws 1869, female convicts for less than five years, from the Third and Fourth judicial districts, were authorized to be confined in the penitentiary; but the penitentiary continued to be managed and supported by the county, and any surplus earnings of the convicts over and above the expense of their maintenance belonged to the county. By an act of congress (chapter 85, U. S. Laws 1864) federal convicts were authorized to be confined in this penitentiary under an agreement between the United States and the penitentiary authorities. Thus it will be seen that, in all these statutes under which prisoners are or may be confined in the Albany penitentiary, the right of absolute control of that institution is recognized as belonging to the county of Albany, its supervisors or penitentiary commissioners. Nor does the act of congress in reference to federal prisoners assume to deal with the state as if this were a state institution; but that act deals exclusively with the penitentiary or its authorities, and not with the state. Again, the argument that, because convicts of other counties are confined in the penitentiary, it is therefore a penal institution of the state, proves too much, for if that reasoning were to be adopted, the imprisonment of federal convicts in the penitentiary would, for the same reason, make it a penal institution of the United States. I do not feel called upon, on this motion, to discuss the question as to whether this is a legal or illegal contract. It was made with the commissioners, or with their sanction, and it would seem that the only question which they could raise on this motion is whether or not they have been absolved from its performance by the act of 1888. If the legislature had intended that the act of 1888 should embrace this penitentiary, it could easily have expressed that intention in unqualified terms. It is with great reluctance and some misgivings that I am forced to reach a conclusion in this case somewhat at variance with the very learned and exhaustive opinion of the attorney general upon this question. My convictions, however, are that this presents a proper case for the exercise of the equitable jurisdiction of the court, and that the act of 1888 has not absolved the defendants from the terms and provisions of their contract, and that a temporary injunction should be granted.